IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

BOGER V. MAGNUS COMPANY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JAMES BOGER, APPELLANT,
V.
MAGNUS COMPANY, APPELLEE.

Filed February 25, 2014.    No. A-13-599.

Appeal from the Workers' Compensation Court: JAMES R. COE, Judge. Affirmed.

Aaron F. Brown, of Brown & Theis, L.L.P., for appellant.

Christopher A. Sievers, of Timmermier, Gross & Prentiss, for appellee.

IRWIN, MOORE, and BISHOP, Judges.

BISHOP, Judge.

James Boger and his employer, Magnus Company (Magnus), stipulated that he sustained a blister to his right big toe while at work, but the nature and extent of the injury was contested and went to trial on May 9, 2013. The Workers' Compensation Court found that Boger suffered an injury to his right toe as a result of an accident arising out of and in the course of employment, but that Boger failed to follow and comply with medical treatment and this made his condition worse. As a result, the compensation court awarded Boger payment for only his first medical appointment and treatment, and nothing thereafter, including no temporary or permanent indemnity. We affirm.

BACKGROUND

Boger, age 44 at the time of the injury, testified that he worked as a machine operator/mold operator at Magnus; he was hired November 8, 2010. He worked with very hot metal, and he had to wear a "complete overgarment" and an "air-conditioned helmet which fed oxygen" to keep him cool. Also, because they were dealing with lead, he had to wear leather steel-toed shoes. Two days after commencing employment with Magnus, Boger developed a blister on his right big toe, showed it to the employer, and then put medicine and a bandage on it

- 1 -

to protect it. He went to see his family doctor, Dr. Edward Montanez, in December because there was "a spot smaller than a dime that could not heal." From December until June 2011, he "put a triple antibiotic on it and change[d] pads" so it "had some cushion on it." The sore on his right big toe did not heal during that time. Boger acknowledged that he did not take all the medication prescribed to him by Dr. Montanez in December.

Six months later, on June 28, 2011, Boger was running a fever and was seen by Dr. Montanez. He received a shot and medicine, and Dr. Montanez recommended that Boger go to the hospital, but Boger elected not to do so. Boger reported to Dr. Montanez each of the next 2 days, but was then referred by Dr. Montanez to go see Dr. Kathleen Grier at a wound care clinic. Boger met with Dr. Grier on July 5. Dr. Grier had Boger continue with the medication prescribed by Dr. Montanez, asked him to use saline and wet-to-dry dressing changes for the wound, and asked him to wear a "Darby shoe." Boger described the "Darby shoe" as an open-toed boot "that's got black mesh on it that your foot rides on a cushion and the black mesh holds your foot in place . . . to alleviate the big toe touching the ground or anything, applying pressure to that." Boger testified that he wore it "every day" and stayed off his feet as he was told. Dr. Grier also recommended that Boger remain off work and that he use crutches. Boger testified that he bought crutches and that he "tried the crutches but it's just an awkward thing, and I wasn't moving, so I just never used the crutches." On cross-examination, Boger was questioned about why he did not use the crutches:

> [Counsel:] Did you make the conscious decision that this is too awkward; therefore, I'm going to disregard my doctor's begging and pleading? Was that your thought process?
>
> [Boger:] My thought process was that I wasn't using the crutches.
>
> [Counsel:] Period, the end?
>
> [Boger:] Yeah.
>
> . . . .
>
> [Counsel:] And Dr. Grier's notes say she wants you to be 100 percent off your foot, and you didn't do that, would [sic] you?
>
> [Boger:] I would say that is correct.

In September 2011, Dr. Grier released Boger to return to work, and in December 2011, a Dr. Hayes (filling in for Dr. Grier while she was on maternity leave) also released Boger to return to work; however, in both instances, Boger testified that the company doctor, Dr. Thomas McKnight, "would not allow it because the work conditions that we worked in, he said that would be bad for this toe. So until it was completely healed, he would not allow me to go back to work due to the heat and environment." Boger stated that Dr. Hayes performed an "Apligraf" in January or February 2012, which Boger understood to be a procedure to place a graft of skin in the wound to form new skin. In May 2012, Dr. Hayes requested an MRI of Boger's right big toe and discovered he had osteomyelitis in the toe. On June 29, Dr. Grier amputated the toe. On July 17, Dr. Grier released Boger to return to work. At that point, Boger learned that he had been "release[d]" from Magnus. He obtained other employment a couple weeks later, by the end of July.

Boger confirmed that when he last saw Dr. Grier on July 17, 2012, she told him it was imperative that he have inlays made for his shoes with a toe filler, to help protect his feet so he could avoid future wounds. On cross-examination at trial in May 2013, Boger was asked, "And you haven't done that?" His response was, "I have not got a little square thing to block my toe. No."

When questioned about other medical issues, Boger testified that he was diagnosed with diabetes in 2005 and that there was a family history of diabetes. He acknowledged that when he first met with Dr. Montanez about his diabetes, the doctor explained to him "the importance of following the medication and treating this with respect," and also recommended that Boger see a diabetic teacher to instruct him on the disease and how to best keep it under control. Boger admitted he did not go see a diabetic teacher when recommended in 2005 and had not done so as of the time of trial in May 2013. Boger also acknowledged that beginning in October 2006, he began experiencing numbness in his legs, and he explained that Dr. Montanez' records describing his diabetes as poorly controlled was partially due to Boger and partially due to the medicine. Boger testified that he was trying different medicines to "find something right that put it under control." Dr. Montanez recommended insulin; however, Boger wanted to leave insulin as "the last alternative," because "[o]nce you go to insulin, then you're done."

In August 2008, when Boger was having some vision problems, he saw Dr. Ira Priluck, who tested his eyes and did not see any diabetic retinopathy at that time. By May 2010, about 6 months before he started working at Magnus, Dr. Priluck diagnosed Boger with bilateral background diabetic retinopathy, which required surgery to close blood vessels in the back of the eye. Boger confirmed that around that time, Dr. Montanez noted that his diabetes was not well controlled.

WORKERS' COMPENSATION COURT DECISION

The compensation court found that on November 10, 2010, Boger was employed by Magnus as a machine operator and that he suffered an injury to his right toe as a result of an accident arising out of and in the course of employment. Magnus stipulated that Boger sustained a blister at work to his right big toe. The parties stipulated that Boger was at maximum medical improvement and that he was not entitled to vocational rehabilitation. They also agreed on his average weekly wage. The dispute was over the nature and extent of Boger's injury. Magnus argued that Boger failed to follow and comply with medical treatment and that his actions or inactions led to the amputation of Boger's right big toe.

The compensation court initially noted that when Boger first sought medical care with Dr. Montanez on December 30, 2010, for the blister on his right big toe, he was prescribed Duricef, an antibiotic, 500 mg by mouth, twice a day, for 10 days. Boger only took six pills, which the compensation court took to mean he took his medication for only 3 out of the 10 days prescribed. Dr. Montanez did not see Boger until 6 months later on June 28, 2011, when Boger presented with a 103-degree temperature and a nonhealing blister. Dr. Montanez recommended hospitalization, but Boger said he had to take a friend to the airport. The trial court further noted that "Dr. Montanez on that treatment date 'chastised [Boger] for not having completed his initial course of antibiotics and not following up sooner for toe recheck.'" The next day, Dr. Montanez referred Boger to Dr. Grier, an orthopedic surgeon who specialized in wound care at a wound

care clinic. Boger saw Dr. Grier on July 5. She prescribed saline and triple wet dressing, and advised that Boger should be off work and on crutches to offload and keep the friction off his toe. She also prescribed a "Darby shoe" with an insole to further offload any weight and friction to Boger's right big toe. Boger was seen in the wound care clinic regularly from July 5, 2011, to June 29, 2012, when Dr. Grier amputated Boger's right big toe. The compensation court noted, "During the pendency of this treatment, Dr. Grier constantly chastised [Boger] for not complying with [Dr. Grier's] prescription for the use of crutches and to completely offload any weight on the right big toe." The compensation court then specifically notes each appointment between Boger and Grier wherein she reiterated the need to offload weight on the right big toe by using crutches: July 19, 2011 (Dr. Grier told Boger to treat the crutch prescription like Boger had broken his leg); August 2 (Boger told Dr. Grier that it was easier for him to stay off his toe without crutches, and Dr. Grier counseled him on the need to use crutches); August 16, August 30, and September 13 (in each appointment, Dr. Grier noted that Boger was not using crutches); September 27 (Dr. Grier notes again that Boger was still not using crutches and that 100-percent use of crutches would give his foot a chance to heal); October 11 (Dr. Grier notes that "despite all our discussions he has not offloaded with crutches yet"); and October 25 (Dr. Grier states, "Again, despite all our pleading and begging he has not gone to offloading with crutches but states he has tried to stay off of it as much as possible"). An MRI to Boger's right big toe on June 4, 2012, showed osteomyelitis, resulting in Dr. Grier performing an amputation of the toe on June 29.

The compensation court noted that Boger had a history of diabetes and found that "[a]lthough [Boger's] condition was not formally diagnosed until 2005 the medical evidence indicates through laboratories studies that [Boger] has had diabetes since 1996." Dr. Montanez started treating Boger for diabetes in March 2005. The court noted that "[t]he treatment included repeated requests for [Boger] to undergo diabetic teaching and repeated admonishments to [Boger] for not taking his medications." The court further notes that in an office visit on September 15, 2007, "Dr. Montanez stated 'Patient reports he now would like to get back on his medications and on to better health,'" and that Boger's "'diabetes was not in control due to [Boger's] noncompliance." Related to the court's concerns about the impact of the diabetes and Boger's unwillingness to follow medical advice, the court noted that months before the injury at issue, in May 2010, Boger had been diagnosed with bilateral diabetic retinopathy to the eyes and was treated with laser therapy. The ophthalmologist, Dr. Priluck, in two office visits, "'stressed the importance of continued diabetic control.'"

The compensation court found that Magnus sustained its burden of proof by a preponderance of the evidence that Boger unreasonably hindered his medical treatment and was not compliant and found that there was sufficient evidence to justify a reduction in Boger's benefits. The compensation court further found that aside from its authority to limit damages pursuant to statute, it also determined that Boger's "actions by noncompliance with recommended medical care after the initial treatment . . . amounted to an independent intervening event so as to terminate Magnus' responsibility for any workers' compensation benefits after December 30, 2010."

ASSIGNMENTS OF ERROR

Boger assigns, condensed and restated, that the Workers' Compensation Court erred (1) by determining that Boger unreasonably refused medical care warranting the reduction of medical and temporary and permanent indemnity benefits, (2) by determining that Boger's failure to use crutches was an independent intervening event when the employer did not affirmatively plead this as a defense, and (3) by failing to award an attorney fee based on the employer's failure to timely pay a medical bill.

STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Hynes v. Good Samaritan Hosp.*, 285 Neb. 985, 830 N.W.2d 499 (2013).

In testing the sufficiency of the evidence to support the findings of fact by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Pearson v. Archer-Daniels-Midland Milling Co.*, 285 Neb. 568, 828 N.W.2d 154 (2013).

ANALYSIS

*Did Boger Unreasonably Refuse or Fail*
*to Cooperate With Medical Treatment*
*Warranting Reduction of Benefits?*

Two workers' compensation statutes deal with reducing benefits for failure to cooperate with medical treatment: Neb. Rev. Stat. § 48-120(2)(c) (Cum. Supp. 2012) and Neb. Rev. Stat. § 48-162.01(7) (Reissue 2010).

Section 48-120(2)(c) states:

If the injured employee unreasonably refuses or neglects to avail himself or herself of medical or surgical treatment furnished by the employer, except as herein and otherwise provided, the employer is not liable for an aggravation of such injury due to such refusal and neglect and the compensation court or judge thereof may suspend, reduce, or limit the compensation otherwise payable under the Nebraska Workers' Compensation Act.

Section 48-162.01(7) states in part:

If the injured employee without reasonable cause refuses to undertake or fails to cooperate with a physical, medical, or vocational rehabilitation program determined by the compensation court or judge thereof to be suitable for him or her or refuses to be evaluated under subsection (3) or (6) of this section or fails to cooperate in such evaluation, the compensation court or judge thereof may suspend, reduce, or limit the compensation otherwise payable under the Nebraska Workers' Compensation Act.

- 5 -

The compensation court notes that § 48-162.01(7) is not particularly applicable, since it focuses on noncompliance of an existing order, which was not the case here. However, the compensation court correctly notes that the Nebraska Supreme Court in *Hofferber v. Hastings Utilities*, 282 Neb. 215, 231, 803 N.W.2d 1, 13 (2011), states that § 48-162.01(7) and § 48-120(2)(c) need to be "read in pari materia" and that the "obvious intent . . . is to make sure that an employer is not liable for extra benefits when an employee's conduct makes his or her condition worse."

These two statutes were also addressed in *Lowe v. Drivers Mgmt., Inc.*, 274 Neb. 732, 740 N.W.2d 82 (2007). In that case, there were two timeframes at issue with regard to the impact of an injured employee's noncompliance on benefits: (1) the period of time following the initial award until a modification action was filed and (2) the time period of the modification proceeding. In *Lowe*, the employee failed to comply with vocational rehabilitation ordered by the compensation court in its initial award; this resulted in the compensation court's reducing the employee's disability benefits for the period of time from the initial award until the commencement of the modification proceeding. However, the compensation court concluded that the noncompliance did not impact benefits after the commencement of the modification proceeding based on the evidence before it, and the Supreme Court agreed.

*Lowe* involved an existing order, therefore § 48-162.01(7) was the controlling statute with regard to noncompliance. The Nebraska Supreme Court noted that the two-part test under that statute is (1) the employee must either refuse to undertake or fail to cooperate with a court-ordered physical, medical, or vocational rehabilitation program, and (2) the employee's refusal must be without reasonable cause. With regard to the compensation court's decision to reduce benefits in the timeframe following the initial award and the modification proceeding, the Supreme Court noted that "it has been held that both parts of this two-part test present factual questions to be determined by the trial judge based upon the evidence" and that the compensation court judge was "not clearly wrong when he ordered a reduction in Lowe's disability benefits." *Lowe*, 274 Neb. at 737-38, 740 N.W.2d at 88. The Supreme Court went on to state:

> We have not previously determined which party bears the burden of proof to establish the two-part test set forth under § 48-162.01(7). However, we have discussed such burden under another provision in the Nebraska Workers' Compensation Act, Neb. Rev. Stat. § 48-120(2)(c) (Supp. 2007), which provision contains language similar to § 48-162.01(7).

*Lowe*, 274 Neb. at 740, 740 N.W.2d at 90.

*Lowe* then quotes § 48-120(2)(c) and states, "When considering this language, we have stated that '[t]he unreasonableness of the refusal of an injured employee to permit an operation to be performed is a question of fact to be determined by the evidence, and the burden of proof . . . is upon the employer.'" 274 Neb. at 740, 743 N.W.2d at 90 (quoting *Simmerman v. Felthauser*, 125 Neb. 795, 251 N.W. 831 (1934)).

In comparing the similarity in language of the two statutes, the Supreme Court makes it clear that for either statute:

[T]he employer bears the burden of proof to demonstrate that an injured employee has refused to undertake or failed to cooperate with a physical, medical, or vocational rehabilitation program and that such refusal or failure is without reasonable cause such that the compensation court or judge may properly rely on such evidence to suspend, reduce, or limit the compensation otherwise payable under the Nebraska Workers' Compensation Act.

*Lowe v. Drivers Mgmt., Inc.*, 274 Neb. 732, 740-41, 740 N.W.2d 82, 90 (2007).

In *Lowe*, the Supreme Court affirmed the compensation court's decision that with regard to the impact of the noncompliance during the later timeframe (commencing with modification proceedings), the employer "failed to demonstrate that [the employee] refused to participate in vocational rehabilitation without reasonable cause and that had he participated in the court-ordered job placement services, he would have been employed at the time of the modification hearing." *Id*. at 741-42, 740 N.W.2d at 91.

*Hofferber v. Hastings Utilities*, 282 Neb. 215, 232, 803 N.W.2d 1, 13 (2011), in referring to *Lowe*, states that "[t]he evidence that the employer *should* have presented was evidence that the employee's condition would have been different had he availed himself of the benefits he had been offered." The Supreme Court goes on to say that "the complete termination of a claimant's right to benefits under the Act," can only be authorized "if evidence is presented to support a finding that had the employee availed himself or herself of the benefits offered, the employee would no longer be disabled." *Id.* The Supreme Court concluded that no such finding was made in that case. *Id*.

Unlike *Hofferber* and *Lowe*, in the record before us, evidence was offered regarding the impact of Boger's noncompliance with medical treatment and the compensation court did make specific findings regarding the effects of that noncompliance. The compensation court relied upon Dr. Grier's March 4, 2013, report which states:

I repeatedly recommended that he get off of the foot completely, use crutches and stay off the foot in an effort to allow the tissues a better chance at healing which I think it would have had a decent chance to do although I cannot guarantee that it would have ultimately healed. I think he would have had a better chance but he consistently came back to the clinic time and time again without using crutches, promising to use them after that visit and then coming back to the next visit without them. . . . I do think his noncompliance was a very big factor in nonhealing of this wound and not being given a chance to heal. Subsequently the prolonged nature of this wound allowed an entry site for contamination and bacterial infection that ultimately ended up involving the underlying bone. Further weightbearing on the plantar ulceration caused further irritation to an already open wound and ultimately led to an amputation of his toe.

The compensation court noted that this came from Boger's own treating wound clinic physician and orthopedic surgeon, and pointed out that Dr. Grier concluded that Boger's "'noncompliance played a significant role in the fact we were never able to make any significant progress with this wound and get it healed.'"

The compensation court was also persuaded by the report of Dr. Timothy Wahl, an expert in diabetes treatment who examined Boger at the request of Magnus. Dr. Wahl agreed with Dr.

Grier that Boger's noncompliance was a significant factor in Boger's ultimate medical condition, and he stated in a January 14, 2013, report:

> I think the initial noncompliance with the antibiotic therapy per Dr. Montanez's records contributed to the continuous soft tissue infection for some number of months. His noncompliance with his blood sugar control certainly contributed to the presence of the infection. In my opinion, the biggest issue in regard to the continued infection in the toe and subsequent need for amputation was the fact that [Boger] was not following recommendations per Dr. Grier in regard to using his crutches and not walking on the foot. There were eight different references to the fact that he was not using his crutches in 2011. Therefore it is my opinion within a reasonable degree of medical certainty the noncompliance with antibiotic therapy, poor control of his diabetes and poor compliance with non weight bearing on the foot all contributed to the amputation with the latter being the most significant factor here.

Relying upon the reports of Drs. Grier and Wahl, the compensation court concluded in its award that the "the employer has met its burden of proof concerning [Boger's] noncompliance with medical care resulted [sic] in [Boger's] amputated big toe. As stated in *Hofferber, supra*, 'an employer is not liable for extra benefits when an employee's conduct makes his or her condition worse.'"

The compensation court held Magnus liable only for the initial treatment with Dr. Montanez on December 30, 2010, and stated:

> [F]rom this date on [Boger] was noncompliant with his antibiotic therapy and other recommended medical treatment and the Court finds that [Boger's] failure to comply with reasonable medical care made his condition worse and that [Magnus] is not liable for any benefits or indemnity after [Boger's] first office visit with Dr. Montanez on December 30, 2010.

The compensation court found that Magnus sustained its burden of proof by a preponderance of the evidence that Boger "unreasonably hindered his medical treatment and was not compliant. The Court determines as a matter of fact that there is sufficient evidence in this case to justify a reduction in [Boger's] benefits."

A compensation court's findings of fact have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Clark v. Alegent Health Neb.*, 285 Neb. 60, 825 N.W.2d 195 (2013). As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given to their testimony, even where the issue is not one of live testimonial credibility. *Pearson v. Archer-Daniels-Midland Milling Co.*, 285 Neb. 568, 828 N.W.2d 154 (2013).

In our review of the record, we cannot say that the compensation court was clearly wrong in making its findings. There is sufficient competent evidence in the record to support the decision to reduce or limit Boger's compensation that may have otherwise been payable under the Nebraska Workers' Compensation Act.

*Attorney Fees.*

Since we conclude the compensation court was not wrong in its decision to limit Boger's benefits, we do not address Boger's assigned error regarding the compensation court's failure to

award payment of medical bills and indemnity beyond the December 30, 2010, treatment. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *Rader v. Speer Auto*, 287 Neb. 116, 841 N.W.2d 383 (2013).

However, the final error assigned by Boger regarding payment of attorney fees relates to the December 30, 2010, treatment, and Magnus' alleged failure to timely pay that bill.

Neb. Rev. Stat. § 48-125(2)(a) (Cum. Supp. 2012) states in part:

> Whenever the employer refuses payment of compensation or medical payments subject to section 48-120, or when the employer neglects to pay compensation for thirty days after injury or neglects to pay medical payments subject to such section after thirty days' notice has been given of the obligation for medical payments, and proceedings are held before the compensation court, a reasonable attorney's fee shall be allowed the employee by the compensation court in all cases when the employee receives an award.

Boger received an award, albeit limited. To the extent Magnus failed to timely pay the medical charges ordered by the compensation court, Boger should have been awarded an attorney fee. However, Magnus argues that "Boger offered no proof of when (or if) any of these medical bills were submitted to the employer with a request for payment." Brief for appellee at 12. Exhibit 9, a "Statement of Account" dated January 11, 2013, includes an itemization of charges with Skyline Medical Center, including the charges for the December 30, 2010, treatment with Dr. Montanez. However, as Magnus contends, there is no evidence revealed in that statement to indicate whether a request was ever made to Magnus to pay any of the charges. We also note that there was no testimony offered at trial regarding nonpayment of this bill being an issue for the compensation court's consideration, nor any motion filed by Boger after the entry of the award (as would have been permitted pursuant to Neb. Rev. Stat. § 48-180 (Cum. Supp. 2012)), suggesting the compensation court failed to address an issue raised at trial. Rather, this seems to be a matter first raised on appeal. An issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal. *DMK Biodiesel v. McCoy*, 285 Neb. 974, 830 N.W.2d 490 (2013).

## CONCLUSION

The compensation court's decision to limit Boger's benefits as a result of Boger's noncompliance with medical treatment is supported by the evidence and complies with the law; it is affirmed.

AFFIRMED.